UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


*In re General Motors ERISA Litigation*          Case No. 05-71085

                                                 Honorable Nancy G. Edmunds

_____/


**ORDER DENYING GENERAL MOTORS DEFENDANTS' MOTION TO DISMISS [21]
AND GRANTING DEFENDANT STATE STREET'S MOTION TO DISMISS [23]**


The General Motors Defendants ("GM Defendants" or "GM") and Defendant State Street Bank and Trust ("State Street") have filed separate Motions to Dismiss in this breach of fiduciary duty case brought under Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. For the reasons that follow, the Court DENIES the GM Defendants' Motion to Dismiss and GRANTS Defendant State Street's Motion to Dismiss.

**I.     Complaint**

The following facts are drawn from the Consolidated Class Action Complaint for Violations of the Employee Retirement Income Security Act ("the Complaint"). For purposes of these Motions to Dismiss, all alleged facts are presumed true.

**A.     The GM Plans**

This case centers around two employee benefit plans established by GM: the General Motors Savings-Stock Purchase Program for Salaried Employees in the United States ("the Salaried Plan") and the General Motors Personal Savings Plan for Hourly-Rate

Employees in the United States ("the Hourly Plan").  (¶ 107.)[1]  Plaintiffs describe both as "defined contribution plans, with a 401(k) feature, with separate accounts maintained for each participant."  (¶ 107.)[2]

The Salaried Plan is a defined contribution plan described to employees as a way "to help you accumulate savings, while at the same time providing you with an opportunity to acquire an equity investment in GM."  (¶ 108-09.)  Participant and GM contributions are made in the form of both after-tax savings and tax-deferred savings.  (¶ 115.)  Investment options include GM stock, mutual funds, and Promark funds.  (¶ 124.)[3]

Six percent of a Salaried Plan participant's eligible base monthly salary is called "Basic Savings."  (¶ 116.)  One-half of Basic Savings must be invested in GM stock throughout the "required retention period," which lasts until December 31 of the year in which the funds were invested.  (¶ 118, 124.)  Participants have discretion to invest the remaining one-half of Basic Savings, or their entire Basic Savings after the required retention period, in GM stock, mutual funds, or Promark funds.  (¶ 122, 124.)

---

[1]Unless otherwise noted, citations refer to the Complaint.

[2]GM quotes Paragraph 107 of the Complaint somewhat differently: "Both Plans are 'defined contribution plans, with a 401(k) feature *and an employee stock ownership feature*, with separate accounts maintained for each participant.'  (*Id.* ¶ 107)."  (Br. of GM at 3 (emphasis added).)  Whether the Plans are "employee stock ownership plans" ("ESOPs") is a material issue in this case, and one about which the parties disagree.  Far from admitting the existence of an "employee stock ownership feature," Plaintiffs vigorously argue that any such description is inaccurate.

[3]Previously, some funds were invested in Electronic Data Systems common stock, DIRECTV Group common stock, and News Corporation Preferred ADSs Fund.  While some funds remain in these investments, "no further contributions or exchanges" may be made.  (¶ 133.)

GM matches Salaried Plan participants' Basic Savings at varying levels. GM's contributions reached as high as eighty percent of participant savings in 2000, but are currently set at twenty percent. (¶ 116-17.) GM's contributions are invested initially in GM stock, but may be moved into other investment options after the required retention period. (¶ 118, 122.)

The text of the Salaried Plan states that the portion of funds invested in GM stock "is an employee stock ownership plan ["ESOP"] under Section 4975(e)(7) of the [Internal Revenue] Code." (¶ 129.) Of those funds, a small amount is invested in short-term fixed income investments. (¶ 126-27.)

The Hourly Plan is similar to the Salaried Plan. It is defined contribution plan described as a way "to save part of your earnings by investing for retirement through convenient and tax-effective payroll deductions." (¶ 135-36.) Participant and GM contributions (described in the Complaint as "profit sharing") are made in the form of both after-tax savings and tax-deferred savings. (¶ 142-44.) The amount of GM contributions is unclear from the Complaint.

Hourly Plan participants may contribute up to sixty percent of their weekly earnings to the Plan, thought this limit varies over time. (¶ 142, 144.) Participants must direct where they wish their contributions to be invested. (¶ 148.) Options include GM stock, mutual funds, or Promark funds. (¶ 149, 156.)

### B.    The Parties

The four plaintiffs named in the Complaint are former GM employees. Al Balnius and Michael Birmingham are participants in the Hourly Plan; Jerry Canter and Bryan Moore are participants in the Salaried Plan. Through their participation in the Plans, each held

3

shares of GM stock.  (¶ 15-18.)  Plaintiffs bring this lawsuit on behalf of a proposed class, which they define as follows:

> All persons who were participants in or beneficiaries of the Plans at any time between March 18, 1999 and the present (the "Class Period") and whose accounts included investments in the GM $1-2/3 Par Value Common Stock Fund, and/or the GM Class H Common Stock Fund.

(¶ 28.)

The GM Defendants include GM itself, GM's President, CEO, and Board Chairman Richard Wagoner, Jr., GM's Investment Management Corporation ("GMIMCo"), the Investment Funds Committee of GM's Board of Directors and its eleven individual members ("the Funds Committee Defendants"), and the seven individual members of GM's Employee Benefits Plans Committee ("the Plans Committee Defendants").  Plaintiffs claim that each of the GM Defendants is a fiduciary of the Plans, with the exception of the members of the Plans Committee Defendants, who had discretionary authority to oversee only the Salaried Plan.  (¶ 19-25, 27.)

Defendant State Street is Trustee and Investment Manager of all GM common stock held in the Plans.  (¶ 26.)  State Street has been Trustee throughout the class period, but did not become Investment Manager until May 28, 1999.  (¶ 4.)

### C.    The Claims

Plaintiffs allege five causes of action.  Although they vary slightly in form, the thrust of Plaintiffs' argument is that the Plan fiduciaries breached their duties under ERISA by investing in GM stock, which, for reasons known to the fiduciaries, was not in the best interest of the Plan participants.

4

Plaintiffs' Count I, against all Defendants, alleges a failure to manage the Plans'
assets prudently and loyally:

> Defendants knew or should have known that General Motors Stock was not
> a suitable and appropriate investment for the Plans . . . .  Investment in
> General Motors Stock . . . did not serve the Plans' purposes of helping
> participants save for retirement, and in fact caused significant
> losses/deprivation to participants' savings.  Despite all of this, these
> fiduciaries continued to offer General Motors Stock as an investment option
> for the Plans and to direct and approve the investment of General Motors
> Common Stock Fund in General Motors Stock, instead of cash or other
> investments.  Similarly . . . , these fiduciaries permitted Company matching
> contributions to be made in General Motors Stock.

(¶ 173.)

Count II, against the GM Defendants with the exception of the Plans Committee
Defendants, alleges failure "to provide complete and accurate information" to Participants
and Beneficiaries of the Plans:

> The Defendants . . . breached their duty to inform participants by failing to
> provide complete and accurate information regarding General Motors Stock,
> making material misrepresentations about the Company's financial condition,
> and, generally, by conveying inaccurate information regarding the soundness
> of General Motors Stock and the prudence of investing retirement
> contributions in the stock.

(¶ 185.)

Count III, against the GM Defendants with the exception of the Plans Committee
Defendants, alleges a failure to monitor appointed Plan fiduciaries and provide them with
accurate information:

> Defendants . . . breached their fiduciary monitoring duties by, among other
> things: failing to ensure that the monitored fiduciaries had access to
> knowledge about the Company's business problems . . . , which made
> Company Stock an imprudent retirement investment; and failing to ensure
> that the monitored fiduciaries completely appreciated the huge risk of
> significant investment by rank and file employees in an undiversified
> employer stock fund which was made up primarily of Company Stock, an

5

> investment that was imprudent and inherently subject to significant downward movements . . . . Defendants . . . knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plans to continue offering the GM Common Stock Fund as an investment alternative for the Plans; (ii) continuing to invest the assets of the Plans in General Motors Stock; and (iii) imprudently failing to diversify the GM Common Stock Fund. Despite this knowledge, . . . Defendants . . . failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

(¶ 196.)

Count IV of the Complaint, against GM, Wagoner, and the Funds Committee Defendants, alleges a breach of the duty to avoid conflicts of interest and to resolve them promptly:

> Defendants breached their duty . . . by, *inter alia*: (i) failing to engage independent fiduciaries to make independent judgments concerning the Plans' investment in the General Motors Stock; (ii) failing to notify appropriate federal agencies, including the SEC and the Department of Labor, of the facts and transactions which made General Motors Stock and unsuitable investment for the Plans; (iii) failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; (iv) with respect to each of the above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and (v) by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plans' investment in Company Stock.

(¶ 205.)

In Count V, against the GM Defendants with the exception of the Plans Committee Defendants, Plaintiffs allege co-fiduciary liability. Essentially, this Count states that Defendants failed to remedy their co-defendants' breaches of fiduciary duty. (*See* ¶ 207-15.)

In Count VI, against Defendant State Street, Plaintiffs allege failure to diversify the GM Common Stock Accounts in violation of the Investment Management Agreement. (*See*

6

¶ 216-25.)  Plaintiffs state, "Pursuant to the Investment Management Agreement, State Street was obligated to 'discharge its duties . . . by diversifying the investments in the Investment Accounts so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so . . . .'" (¶ 221.)

## II.    Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a Complaint.  In a light most favorable to Plaintiffs, the court must assume that Plaintiffs' factual allegations are true and determine whether the Complaint states a valid claim for relief.  *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996); *Forest v. United States Postal Serv.*, 97 F.3d 137, 139 (6th Cir. 1996).  This standard of review "'requires more than the bare assertion of legal conclusions.'"  *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)).  The Complaint must include direct or indirect allegations "respecting all the material elements to sustain a recovery under *some* viable legal theory."  *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citations omitted) (emphasis in original).

## III.    Discussion

### A.    GM Defendants

#### 1.    Statute of Limitations

The GM Defendants first argue that Plaintiffs' claims are barred by ERISA's statute of limitations.[4]  The parties agree that the relevant limitations period for Plaintiffs' lawsuit

---

[4]Of course, Defendant State Street would also benefit from such a finding, and therefore adopts the GM Defendants' argument.  (Br. of State Street at 1.)

is "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C. § 1113(2).  The Sixth Circuit recently defined "actual knowledge" under this statute as "knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute."  *Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003).

Central to GM's argument is its assertion that "Plaintiffs have not only admitted that the facts central to their claims existed during the class period, but also that they had knowledge of them more than three years prior to filing their Complaint."  (Br. of GM at 11 (quoting Compl. ¶ 106).)  The apparent source of this assertion is Paragraph 106 of the Complaint, which states,

> During the Class Period, Defendants' direct and indirect communications with the Plans' participants included statements regarding investments in Company Stock.  Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plans' participants via the Company's website and Plan-related documents which incorporated and/or reiterated these statements.  Defendants also acted as fiduciaries to the extent of this activity.

(¶ 106.)  This language does not establish that Plaintiffs had "actual knowledge" of the crucial facts; it merely states that GM made certain information public.  As the Sixth Circuit noted in *Wright*, however, "'[a]ctual knowledge must be distinguished from constructive knowledge.'"  349 F.3d at 329 (quoting *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992)).  Paragraph 106 is therefore not an admission of actual knowledge.

At oral argument, GM also quoted Paragraph 186 of the Complaint, which states,

With respect to the Company and certain other fiduciary Defendants, upon information and belief, such communications were disseminated directly to *all* participants, including prospectuses that incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports. In addition, upon information and belief, the Company communicated directly with *all* participants regarding the merits of investing in General Motors Stock in company-wide and uniform communications, and, yet , in the context of such communications, failed to provide complete and accurate information regarding General Motors Stock as required by ERISA.

(¶ 186 (emphasis in original).)  To be sure, this language leans closer toward "actual knowledge."  But actual knowledge of what?  Plaintiffs' use of "such representations" here is shorthand for "failing to provide complete and accurate information . . . , making misrepresentations . . . , and . . . conveying inaccurate information . . . ."  (¶ 185.)

GM argues that the statute of limitations clock started ticking as soon as the relevant statements were made to Plaintiffs.  But GM's statements *themselves* did not provide knowledge of the alleged violations because those statements were allegedly misleading.  Rather, the essential knowledge was provided only when Plaintiffs learned of the inaccuracy of the statements.  To put it another way, Plaintiffs did not at first realize that they were being misled, and therefore did not yet have "knowledge of the facts or transaction that constituted the alleged violation . . . ."  *Wright*, 349 F.3d at 330.  Indeed, as Plaintiffs point out, if GM's statements were false and misleading as alleged, they did not put Plaintiffs on notice of *anything*.  (Br. of Pls. at 16.)

GM discounts the fact that *Wright* was decided on a motion for summary judgment, as opposed to a motion to dismiss.  (Repl. Br. of GM at 8.)  But this distinction is crucial.  In *Wright*, the court rested its decision on an abundance of evidence about the process by which the plaintiffs discovered the defendant's wrongdoing--evidence no doubt developed during the discovery process.  *See* 349 F.3d at 324-25.  In the present case, there has

9

been no discovery, and thus there are no facts to support GM's contention that Plaintiffs had "actual knowledge" of the facts giving rise to their claims.  GM may have a valid argument as to ERISA's statute of limitations, but it is too soon to know.

Because the Complaint contains no admission of "actual knowledge" of GM's wrongdoing more than three years before the Complaint was filed, ERISA's statute of limitations provides no basis to dismiss the Complaint at this time.

### 2.    Plaintiffs' Count I

In Count I, Plaintiffs allege that Defendants violated ERISA's requirement that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the plan participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . ."  29 U.S.C. § 1104(a)(1).

GM[5] contends that the Plans are Employee Stock Ownership Plans ("ESOPs") subject to a presumption of reasonableness, and that Plaintiffs have failed to allege sufficient facts to overcome that presumption.  Plaintiffs counter that whether the Plans are ESOPs is a question of fact not appropriately before this Court at this stage in the litigation. Plaintiffs further argue that if the Court opts to resolve the ESOP question, it should find that the Plans are not ESOPs, but even if it finds otherwise, it should find that Plaintiffs have alleged sufficient facts to overcome the presumption of reasonableness.

### a.    The ESOP Presumption of Reasonableness

---

[5]The GM Defendants take the lead in arguing this issue, though Plaintiffs' allegation reaches all Defendants here.

"In drafting the ESOP provisions of ERISA, Congress intended to encourage employees' ownership of their employer company.  In order to promote this goal, Congress carved out specific exceptions to certain fiduciary duties in the case of an ESOP."  *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995).  Thus, while ERISA ordinarily imposes high fiduciary duties of loyalty and prudence and an exclusive purpose requirement, "as a general rule, ESOP fiduciaries cannot be held liable for failing to diversify investments, regardless of whether diversification would be prudent under the terms of an ordinary non-ESOP pension plan."  *Id.*  Moreover, an ESOP is exempted from ERISA's otherwise strict rules against self-dealing.  *Id.* (citing *Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir. 1992)).

This is not to say that ESOP fiduciaries are not subject to ERISA's general fiduciary responsibilities, but that ESOP status must be considered when determining whether they have violated those responsibilities.  In the Sixth Circuit,

> a proper balance between the purpose of ERISA and the nature of ESOPs requires . . . review [of] an ESOP fiduciary's decision to invest in employer securities for an abuse of discretion.  In this regard, we will presume that a fiduciary's decision to remain invested in employer securities was reasonable.  A plaintiff may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision.

*Id.* at 1459.  Under this standard, a plaintiff asserting a prudence claim must show that the ESOP fiduciaries' decision to invest in company stock was an abuse of discretion.  *Id.*  Further, "in attempting to rebut the presumption, the plaintiff must show that the ERISA fiduciary could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he

11

invest exclusively in employer securities."  *Id.* (citing *Moench v. Robertson*, 62 F.3d 553, 1995 U.S. App. LEXIS 21546, *56 (3d Cir. 1995)).

### b.    The Plans are ESOPs

ERISA defines an ESOP as an individual account plan "which is designed to invest primarily in qualifying employer securities . . . ."  29 U.S.C. § 1107(d)(6)(A).  ESOPs must be qualified under the Internal Revenue Code and any other requirements that the Secretary of the Treasury deems appropriate.  *Id.*

Plaintiffs assert that "the facts in this case will demonstrate that the Plans are not ESOPs . . . ."  (Br. of Pls. at 24 n. 10.)  But whether the Plans are ESOPs depends entirely upon whether they invest primarily in qualifying GM stock and meet the guidelines set by the Internal Revenue Code and the Secretary of the Treasury.  29 U.S.C. § 1107(d)(6). These questions are not, as Plaintiffs contend, factual questions requiring expert testimony. They are purely legal questions requiring application of the relevant law to the text of the Plans, a task well within the province of this Court.[6]

Pointing to the text of the Plans, GM contends that "[t]here is no genuine dispute that the portions of the Plans designed to invest in the GM stock funds meet the threshold requirement of an ESOP."  (Reply Br. of GM at 12.)  Specifically, the Preface to Article III of the Salaried Plan states,

---

[6]In support of its Motion to Dismiss, Defendant State Street provides the texts of the Salaried Plan and the Hourly Plan.  These documents are appropriately before the Court, since Plaintiffs refer to and quote from them at length.  *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) ("'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.'") (quoting *Venture Assoc. v. Zenith Data Sys.*, 987 F.2d 429, 431 (7th Cir. 1993)).

> The portion of the Program assets invested in the General Motors . . . Common Stock . . . is designed to invest primarily in qualifying employer securities as defined by Section 4975(e)(8) of the [Internal Revenue] Code and is an employee stock ownership plan under Section 4975(e)(7) of the Code.  This Article III applies to this ESOP portion of the program.

(Salaried Plan at 24.)  Article IX of the Hourly Plan begins,

> The portion of the Plan that consists of Deferred Assets and After-Tax Assets that are invested in the Corporation's Common Stock Funds, including any dividends, earnings or gains thereon (the "ESOP portion" or "ESOP"), is designed to invest primarily in qualifying securities as defined by Section 4975(e)(8) of the Code, and is an employee stock ownership plan under Section 4975(e)(7) of the Code.  This Article IX applies to this ESOP portion of the Plan.

(Hourly Plan at 74.)  These provisions satisfy the principal requirement that an ESOP "must be formally designated as such" and must "specifically state[] that it is designed to invest primarily in qualifying employer securities . . . ."  26 C.F.R. § 54.4975-11(a)(2), (b).

Plaintiffs offer two legal arguments why the Plans are not ESOPs.  First, they contend that "each plan states that it is a § 404(c) plan, which is inconsistent with Defendants' current argument that the plans are ESOPs."  (Br. of Pls. at 26.)  Plaintiffs quote *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 284 F. Supp.2d 511 (S.D. Tex. 2003) ("*Enron ERISA*"), in which the court stated, "The Secretary of Labor has interpreted [Section 404(c)] as inapplicable to ESOPs because it applies only to plans that give the participants a wide range of investments from which to select."  *Id.* at 575 n.75 (citing 29 C.F.R. § 2550.404c-1).  But contrary to Plaintiffs' assertion, neither of the Plans "states that it is a § 404(c) plan."[7]  Indeed, Section 404(c) is merely a means for defendants

---

[7]The Court is aware of only one reference to Section 404(c) in the text of the Plans, which does not support Plaintiffs' assertion:

> Any Participant or beneficiary, who makes an investment election permitted

13

to avoid fiduciary liability in the case of "a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over assets in his account, *if* a participant or beneficiary exercises control over the assets in his account . . . ." 29 U.S.C. § 1104(c) (emphasis added). *See also Meinhardt v. Unisys Corp. (In re Unisys Sav. Plan Litig.)*, 74 F.3d 420, 446 (3d Cir. 1996) ("*Unisys Erisa*") ("section 1104(c) is akin to an exemption from or a defense to ERISA's general rule, relieving fiduciaries in the appropriate circumstances of the liability to which they would otherwise be exposed"). Thus, a number of circumstances must take place before a defendant has the benefit of Section 404(c). At best, *Enron ERISA* supports the proposition that Defendants *may* not have the benefit of Section 404(c) in defending this action.[8] It does not, however, resolve whether the Plans are ESOPs.

Second, Plaintiffs rely on the "Summary Plan Descriptions" that GM sent them, which state that the purpose of the Salaried Plan is "to help [participants] accumulate savings, while at the same time providing [them] with an opportunity to acquire an equity investment in GM stock." (¶ 109.) The purpose of the Hourly Plan is "to allow [participants] to save part of [their] earnings by investing for retirement through convenient and tax-effective payroll deductions." (¶ 136.) Plaintiffs note that "[n]either Plan states that its

---

under the Plan or otherwise exercises control permitted under the Plan over the assets in the account, shall be deemed the named fiduciary under ERISA responsible for such decisions to the extent that such designation is permissible under applicable law and that the investment election or other exercise of control is not protected by Section 404(c) of ERISA, as amended.

(Salaried Plan at 40; Hourly Plan at 71.)

[8]The Parties do not address this specific issue.

14

purpose is to allow Plan participants to invest primarily in GM stock" (Br. of Pls. at 26), and that the Plans "offer their participants a wide array of investment choices, among them a Company stock fund, but the Plans are not designed in such a way that Company stock is the primary Plan investment." (*Id.* at 25.)  Contrary to Plaintiffs' assertion, however, both Plans state that they are "designed to invest primarily in qualifying securities as defined by Section 4975(e)(8) of the [Internal Revenue] Code, and [are] employee stock ownership plan[s] under Section 4975(e)(7) of the Code."  (Salaried Plan at 24; Hourly Plan at 74.) Further, "[a]n ESOP may form a portion of a plan the balance of which includes a qualified pension, profit-sharing, or stock bonus plan which is not an ESOP.  A reference to an ESOP includes an ESOP that forms a portion of another plan."  29 C.F.R. § 2550.407d-6(a)(4).  Thus, the fact that the Plans serve more than one purpose does not defeat ESOP applicability.  The Plans were very clearly designed as ESOPs to invest primarily in GM stock.

Based on a review of the Plans and the parties' arguments, it is clear to the Court that as a matter of law, the Plans at issue are indeed ESOPs. Plaintiffs have provided no sound basis to hold otherwise, and have cited nothing in the text of the Plans inconsistent with an ESOP.

### c. The ESOP Presumption of Reasonableness May Apply to a Motion to Dismiss Pursuant to Rule 12(b)(6).

Based on *Kuper*, GM argues that Plaintiffs must allege facts sufficient to overcome the "presumption of reasonableness."  Unlike the present case, however, *Kuper* went to trial in the district court, and therefore presented a fully developed record upon which to

apply the presumption. *Id.* at 1459. The Sixth Circuit has not ruled on how *Kuper* applies to a motion to dismiss.

Plaintiffs cite a number of cases, including two from this district, supporting their argument that the presumption of reasonableness is an evidentiary issue which is inconsistent with the simple notice pleading requirement of Federal Rule of Civil Procedure 8(a), and therefore is not appropriate for consideration on a motion to dismiss. For example, in *In re CMS Energy ERISA Litigation*, 312 F. Supp. 2d 898 (E.D. Mich. 2004) ("*CMS ERISA*"), the court "note[d] its agreement that [the ESOP presumption of reasonableness] can be overcome by a showing that a prudent fiduciary would have made a different investment decision, and that *this argument cannot carry a motion to dismiss* made under Fed. R. Civ. P. 12(b)(6)." *Id.* at 914 n.10 (internal citation omitted) (emphasis added). And in *Rankin v. Rots*, 278 F. Supp. 2d 853 (E.D. Mich. 2003), a case arising out of the Kmart bankruptcy, the court read *Kuper* as standing for two important propositions:

> First, the fact that the Plan requires investment in Kmart stock will not ipso facto relieve the [defendants] of their fiduciary obligations to prudently invest or to diversify. Second, whether or not they have breached their fiduciary duties requires development of the facts of the case. The result of these two points is that [the plaintiff] has stated a claim against them; whether or not she will prevail is another matter to be determined later.

*Id.* at 879. *See also In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 828 (S.D. Ohio 2004) ("it is neither necessary nor appropriate for the Court, at this juncture, to make a determination of whether the Plan or the Fund qualifies as an ESOP."); *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 670 (E.D. Tex. 2004) ("*EDS ERISA*")

16

("requiring Plaintiffs to affirmatively plead facts overcoming the ESOP presumption violates Rule 8(a)'s notice pleading requirement").[9]

GM, however, cites several cases in which other courts have granted motions to dismiss based on the presumption of reasonableness. In *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004), the Ninth Circuit held that the district court's dismissal of the plaintiffs' claim with prejudice was appropriate because the "alleged facts effectively preclude[d] a claim . . . , eliminating the need for further discovery." *Id.* at 1098-99. The court noted that the materials attached to the complaint demonstrated that the company at issue "was far from the sort of deteriorating financial circumstances" of companies subject to similar actions, "and was, in fact, profitable and paying substantial dividends throughout [the class] period." *Id.* at 1099 (comparing facts of *Moench*, 62 F.3d at 572). Similarly, in *In re Duke Energy ERISA Litigation*, 281 F. Supp. 2d 786 (W.D.N.C. 2003), the court followed the Ninth Circuit's decision in *Wright* by finding that the plaintiffs had failed

---

[9]In *EDS ERISA*, the district court rested its holding on *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), a recent case in which the U.S. Supreme Court held that in a Title VII discrimination case, a plaintiff need not plead facts sufficient to establish a prima facie case under the *McDonnell Douglas* evidentiary framework. The Supreme Court had reasoned in part that the *McDonnell Douglas* framework does not apply to all Title VII cases, but only where a plaintiff can present no direct evidence of discrimination. *Id.* at 511-12. Thus, at the pleading stage, a plaintiff still has two possible theories. The district court in *EDS ERISA* applied this reasoning to the ESOP presumption of reasonableness context, finding that it would be similarly inappropriate to determine at the pleading stage which of two alternate theories--the Plan is an ESOP, or it is not--the facts would ultimately support. 305 F. Supp. 2d at 670. Necessary to the court's holding, however, was its initial decision not to resolve whether the plans at issue were ESOPs. *Id.* This Court does not disagree with the reasoning of *EDS ERISA*, and if Plaintiffs had given the Court any reason to doubt that the Plans are indeed ESOPs, the Court would be inclined to follow that case. But given that this Court has already held that the Plans are ESOPs as a matter of law, and that Plaintiffs therefore have no alternative but to overcome the presumption of reasonableness, *Swierkiewicz* does not further Plaintiffs' argument.

to "allege that Duke Energy was anything other than a viable, strong company with substantial assets. In fact, . . . Duke Energy is a solid, viable company, far from 'impending collapse,' and not in 'dire circumstances.'" *Id.* at 795. And in *In re Calpine Corp. ERISA Litigation*, 2005 U.S. Dist. LEXIS 9719 (N.D. Cal. Mar. 31, 2005) ("*Calpine ERISA*"), the court held that based on the facts before it, the plaintiffs "have not and cannot allege facts that could rebut the presumption of prudence." *Id.* at *17.[10]

Upon close inspection, most of the cases cited by Plaintiffs and by GM can be reconciled. The importance of the cases cited by GM is not that the plaintiffs *did not* allege facts sufficient to overcome the presumption of reasonableness, but that the plaintiffs *could not* allege such facts--they pled themselves out of court, as their complaints and the supporting documentation *precluded* relief. The Court agrees with the cases on this point; here as well, if Plaintiffs' alleged facts preclude their ability to overcome the presumption of reasonableness, the Court will dismiss the Complaint.

But the Court also agrees with the cases cited by Plaintiffs, including cases from this district, holding that to impose on Plaintiffs an affirmative burden to plead the specific facts necessary to overcome the presumption of reasonableness would be inconsistent with Rule 8(a)'s notice pleading requirement.

---

[10]GM also points out that in other contexts, courts have required plaintiffs to plead facts sufficient to overcome legal presumptions. *See, e.g., De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("To overcome 'the 'presumption of separateness' afforded to related corporations,' Plaintiffs must come forward with 'the showing of actual domination required to pierce the corporate veil.'") (citations omitted); *Wroblewski v. Washburn*, 965 F.2d 452, 460 (7th Cir. 1992) ("To survive a motion to dismiss for failure to state a claim [for discrimination], a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.").

In sum, Defendants are entitled to a presumption of reasonableness in this case. At this early stage of litigation, however, Plaintiffs' burden is only to put Defendants on notice of a viable claim for relief, and they need not allege every specific fact that must be proven in furtherance of their claim. Count I will be dismissed if, in light of the presumption of reasonableness, Plaintiffs' alleged facts preclude relief.

### d.    Plaintiffs' Alleged Facts Support a Finding that Defendants Violated their Fiduciary Duties.

Plaintiffs' primary allegation, which recurs throughout the Complaint in various contexts, is that Defendants "ignored serious red flags that should have alerted them to the fact that General Motors Stock was not a prudent investment for the Plans." (¶ 36.) To be sure, this language suggests a theory based on general ERISA-imposed fiduciary duties, rather than the duties specific to ESOPs.[11] But this alone is not does not necessarily preclude recovery. The Court must determine whether the facts alleged in the complaint and in the referenced documents are inconsistent with a finding in Plaintiffs' favor.

An analysis of the facts that Plaintiffs will eventually need to prove begins with *Kuper*, in which the defendant's stock declined from more than $50 per share to about $10 per share in an eighteen-month period. The court noted that the "plaintiffs merely

---

[11]Plaintiffs' synopsis of Count I reads,

Specifically, Plaintiffs allege in Count I that Defendants breached their fiduciary duties in violation of ERISA by failing to prudently and loyally manage the Plans' investment in General Motors Stock, continuing to offer General Motors Stock as an investment option, making the Company Contribution in General Motors Stock, and holding virtually all assts of the General Motors Common Stock Fund in General Motors Stock when the stock no longer was a prudent investment for participants' retirement savings.

(¶ 7.)

assert[ed] that defendants' decision to continue to hold [company] stock was unreasonable because defendants were aware of events that would continue to cause [a] decline in value." 66 F.3d at 1460. The court found that because "a prudent fiduciary acting under similar circumstances" would not necessarily have acted differently, this conduct alone was insufficient to overcome the presumption of reasonableness. *Id.* at 1459.

In *Wright*, the Ninth Circuit echoed this reasoning, stating that "[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the [ESOP] presumption." 360 F.3d at 1099. In a footnote, the court distinguished cases reaching the opposite result, including one from this district:

> Plaintiffs point to two decisions that are allegedly counter to this analysis, *Stein v. Smith*, 270 F. Supp. 2d 157 (D. Mass. 2003), and *Rankin v. Rots*, 278 F. Supp. 2d 853 (E.D. Mich. 2003). Although in both cases the courts . . . denied 12(b)(6) motions to dismiss, each case is readily distinguishable. In *Smith*, the complaint specifically alleged that the company's "financial collapse," including "an accumulation of large, undisclosed losses on major projects as well as an impending liquidity crisis that was not adequately disclosed to the public," played a pivotal role in the administrators' breach of their fiduciary duties. 270 F. Supp. 2d at 164. Moreover, the complaint alleged that "defendant Smith was integrally involved in making decisions about bidding and disclosure of S & W's finances, and that the other defendants either were aware or should have been aware of the mounting problems." *Id.* Unlike the present case . . . , in which the only allegations involved downward fluctuations in stock price, the allegations in *Smith* clearly implicated the company's viability as an ongoing concern. Similarly, in *Rankin*, the company at issue (Kmart), went bankrupt. The complaint specifically alleged that the plan administrators "failed to give Plan participants accurate, complete, non-misleading and adequate information about the compositions of the Plans' portfolios and accurate information about Kmart and its true financial condition." *Rankin*, 278 F. Supp. 2d at 863.

360 F.3d at 1099 n.5.

Another recent case adds to this analysis. In *Lalonde v. Textron, Inc.*, 270 F. Supp. 2d 272 (D.R.I. 2003), a federal district court held, in an often-cited opinion, that the

presumption of reasonableness "may be overcome when a precipitous decline in the employer's stock is combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement." *Id.* at 280. Applying this standard, the district court found that the plaintiffs had failed to overcome the presumption, because "at no time was Textron stock unsuitable for investment." *Id.*

When *Textron* reached the First Circuit, it was vacated in part. 369 F.3d 1, 7-8 (1st Cir. 2004). The appellate court did not disagree with the district court's articulation of the applicable standard, but took issue with the finding that the plaintiffs had failed to meet their burden under Rule 12(b)(6):

> [T]he district court's analysis, while perhaps convincing on its own terms, failed to take account of plaintiffs' allegation that, during the period identified in the complaint, Textron artificially inflated its stock price by concealing "the disparate problems throughout Textron's segments and their adverse effect on Textron which are the subject of a federal securities lawsuit by shareholders against Textron and certain of its officers and directors." While this allegation is not terribly specific, Textron surely is aware of the nature of the charges it faces in the separate lawsuit. The allegation is thus sufficient to play its part in effectuating the purposes of Fed. R. Civ. P. 8(a): to give Textron "fair notice of what [the plaintiffs'] claim is and the grounds upon which it rests." And, when combined with the other allegations, it is sufficient to clear the Rule 12(b)(6) hurdle. . . . The odds of plaintiffs succeeding on their breach of fiduciary duty claims against the Textron defendants might be very long, but "that is not the test."

*Id.* at 6-7 (internal citations omitted).

These authorities provide a map for the evidence that Plaintiffs will eventually need to produce in furtherance of their claim. It will not be enough for Plaintiffs to prove that GM stock was an unwise investment or that Defendants ignored a decline in stock price. Rather, to overcome the presumption of reasonableness, Plaintiffs must show that the circumstances would have prompted a reasonable fiduciary in the same ESOP

circumstances to make different investment decisions.  Specifically, Plaintiffs must prove

that Defendants were aware of facts showing that GM's "viability as an ongoing concern"

was in jeopardy.  Or, as articulated in the district court opinion in *Textron*, Plaintiffs must

show "a precipitous decline in the employer's stock . . . combined with evidence that the

company is on the brink of collapse or is undergoing serious mismanagement."  270 F.

Supp. 2d at 280.

Turning to the facts of the present case, Plaintiffs make numerous detailed

allegations that, in sum, amount to nothing short of a financial crisis for GM.  Plaintiffs

summarize GM's problems as follows:

> Throughout the Class Period, a major issue for General Motors Corporation . . . has been massive, under-funded healthcare and defined-benefit pension obligations for tens of thousands of employees, retirees and their beneficiaries through defined-benefit pension plans and healthcare plans.  Because many of the fiduciaries of the Plans are also fiduciaries of the defined-benefit pension and healthcare plans, these fiduciaries have been keenly aware of the burgeoning crisis facing the Company going forward.  As the market began to become aware of the scope of GM's problems earlier this year, the Company's stock price dropped precipitously, analysts began making "sell" recommendations, and the Company's unsecured debt was reduced to "junk" status--all based on information that has long been known to the fiduciaries.

(¶ 5.)

While conceding that "GM's stock price has declined overall during the class period"

(Br. of GM at 21), GM also cites some very strong facts of its own, which unquestionably

counter Plaintiffs' allegations:

> GM's annual reports filed with the SEC . . . establish that throughout the six-year class period GM has been a solvent and profitable business enterprise.  These public filings, which are referred to and thus incorporated by the Complaint, show that GM's total assets increased from $273 billion in 1999 to $480 billion in 2004, and stockholder's [sic] equity during that period increased from $20 billion to nearly $28 billion.  GM's revenues increased

from $176 to $193 billion, and GM was profitable every full year during the
class period. Moreover, despite allegations of recent adverse developments
in GM's business, plaintiffs do not allege GM has ever reduced or failed to
pay its regular $2.00 per share dividend for any quarter . . . .

(Br. of GM at 20-21 (citing GM 2004 Form 10-K at 2, 6, 22, 38, 56, 71, 84, 86)).)

These facts might resolve the matter in favor of GM under other circumstances.

Here, however, Plaintiffs allege that the numbers are misleading--and purposefully so. It

is GM's *hidden* financial liabilities, Plaintiffs argue, that threaten the long term viability of

the company.

Plaintiffs allege, among other things, that GM's "accounting slight of hand" regarding

the funding of its pensions has "artificially inflated GM's earnings." (¶ 57-59.) This

allegedly fuzzy math, Plaintiffs contend, "provides the critical elements for 'a perfect storm'-

-especially when one takes into account GM's declining fortunes in the marketplace and

its massive, under-funded healthcare obligations." (¶ 60.) Plaintiffs state that GM has "no

plan whatsoever for meeting the $65 billion or more in unfunded healthcare costs." (¶ 67.)

And Plaintiffs quote several publications and investors questioning GM's ability to stay

afloat, including one business magazine article stating, "Private equity investors seem to

believe that the company's global cost handicap will eventually force it into bankruptcy court

. . . ." (¶ 79.)[12] In Count I specifically, Plaintiffs allege that "at least some of the Defendants

had actual knowledge of the Company's corporate malfeasance and questionable reporting

---

[12]GM takes issue with Plaintiffs' adoption of several critical articles and analyses or
GM's finances. But as the First Circuit noted in *Textron*, GM must "surely [be] aware of the
nature of the charges" raised in the quoted publications. 369 F.3d at 6. Plaintiffs'
allegations, including those adopted from other sources, are "sufficient to play [their] part
in effectuating the purposes of Fed. R. Civ. P. 8(a): to give [Defendants] 'fair notice of what
[Plaintiffs'] claim is and the grounds upon which it rests.'" *Id.* at 7.

and business practices," and that the Investment Funds Committee Defendants in particular "were keenly aware of GM's crippling legacy costs and the accounting methods to mask this issue." (¶ 177.)

This is not a case in which Plaintiffs "merely assert that defendants' decision to continue to hold [GM] stock was unreasonable because defendants were aware of events that would continue to cause [a] decline in value." *Kuper*, 66 F.3d at 1460. Rather, Plaintiffs contend that as bad as they are, the numbers are misleading because GM has "artificially inflated" its earnings. Plaintiffs also fervently contend that GM's dire financial straits and its serious mismanagement have put it at risk of collapse.

Whether Plaintiffs can provide proof of their allegations is an issue for another day, after discovery has developed a factual record. But as the above discussion demonstrates, Plaintiffs have alleged facts that would support a finding that a "prudent fiduciary acting under similar circumstances" would have acted differently. Because none of the facts here preclude relief--indeed, these are exactly the facts that Plaintiffs will need to prove--and because Defendants have been given fair notice of the claims against them, Plaintiffs' Count I sufficiently states a claim for relief.

### 3.    Plaintiffs' Count II

In Count II, Plaintiffs allege that certain GM Defendants

breached their duty to inform participants by failing to provide complete and accurate information regarding General Motors Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of General Motors Stock and the prudence of investing retirement contributions in the stock.

(¶ 185.)

24

GM asks the Court to dismiss Count II because Plaintiffs "have failed to plead detrimental reliance," and because Plaintiffs "have not identified any material misrepresentations or omissions." GM further argues that it had no duty to provide complete and accurate information to Plaintiffs. (Br. of GM at 25.)

### a.      Plaintiffs have Alleged Detrimental Reliance

GM argues that Plaintiffs have failed to allege the element of detrimental reliance. GM quotes *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3rd Cir. 2003), in which the court concluded that "there is no reasonable reading of [the plaintiff's] complaint--even under the liberal pleading requirements contained in Rule 8 of the Federal Rules of Civil Procedure--pursuant to which [she] can be said to have alleged a material misrepresentation . . . upon which she relied to her detriment." *Id.* at 459-60.[13]

The same cannot be said of the Complaint in this case. Plaintiffs allege,

> As a consequence of the failure of the Defendants . . . to satisfy their disclosure obligations under ERISA, participants lacked sufficient information to make informed choices regarding investment of their retirement savings in General Motors Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by participants, that General Motors Stock was an inherently unsuitable and inappropriate investment option for their Plan accounts. . . . [A]s a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

(¶ 190-91.)

---

[13]*Horvath* does not discuss whether Rule 9(b) applies to ERISA claims sounding in fraud.

This plain statement suffices to put GM on notice of the claim against it.[14]  Plaintiffs have therefore alleged detrimental reliance to the Court's satisfaction.

### b.      Allegations "Sounding in Fraud" Must Satisfy Rule 9(b)

GM argues that Count II "sounds in fraud," and that Plaintiffs' generalized allegations fail to satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Plaintiffs do not argue that their claim satisfies Rule 9(b); they contend simply that Rule 9(b) does not apply to ERISA actions based on a breach of fiduciary duty.

Under the liberal pleading standard of Federal Rule of Civil Procedure 8(a), a complaint needs only to set forth "a short and plain statement of the claim," sufficient to put the defendant on notice.  "In all averments of fraud or mistake," however, Rule 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).

Count II complains of GM's "failing to provide complete and accurate information," "making material misrepresentations," and "conveying inaccurate information."  (¶ 185.) To be sure, this contains familiar fraud language, but as Plaintiffs point out, several courts insist that where ERISA provides the underlying claim, Rule 8(a) applies.  In *Rankin*, for example, when faced with the same issue, the Court held,

> While some of the allegations in support of their claim are similar to fraud allegations, i.e. that they provided false and misleading information, the gravamen of [the plaintiff's] claim is grounded in ERISA.  The heightened pleading requirement under Rule 9(b) will not be imposed where the claim is

---

[14]As discussed below, the heightened pleading requirements of Rule 9(b) may apply to parts of this Count II.  Rule 9(b) states that "the *circumstances constituting* fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b) (emphasis added).  Thus, the detrimental reliance element need not be pled with particularity.

> for a breach of fiduciary duty under ERISA.  [The plaintiff's] ERISA claims .
> . . are not disguised fraud claims; they are ERISA claims.

278 F. Supp. 2d at 866.  Similarly, the court in *CMS ERISA* noted,

> the claims. . . sounding in fraud have to do with the communication of
> inaccurate information, and the failure to disclose transactions which
> "rendered the financial statements of CMS materially false."  These general
> allegations are asserting a breach of fiduciary duty, not an intent to deceive,
> as plaintiffs contend.  The court is not persuaded that plaintiffs have made
> any claims sounding in fraud.

312 F. Supp. 2d at 909.  *See also In re Xcel Energy, Inc.*, 312 F. Supp. 2d 1165, 1179 (D.

Minn. 2004) ("In cases where a fraud, misrepresentation or omission is alleged to have

occurred but is not itself the basis of the alleged breach, Rule 9(b) is not applied.")

        *Rankin* and *CMS ERISA*, both of which were decided in this district, followed a Ninth

Circuit precedent, *Concha v. London*, 62 F.3d 1493 (9th Cir. 1995), which highlighted the

differences between a fraud claim and a fiduciary duty claim:

> The reasons for requiring compliance with Rule 9(b) in fraud claims,
> but not in breach of fiduciary duty claims generally, can be understood by
> considering the differences between the respective causes of action.  Fraud
> arises from the plaintiff's reliance on the defendant's false representations of
> material fact, made with knowledge of falsity and the intent to deceive.
> Plaintiffs may fairly be expected to identify with specificity the defendant's
> alleged misrepresentations, though they are not expected to plead with
> specificity the defendant's state of mind.  Rule 9(b) thus requires that
> plaintiffs specifically plead those facts surrounding alleged acts of fraud to
> which they can reasonably be expected to have access.
>
> In contrast, the circumstances surrounding alleged breaches of
> fiduciary duty may frequently defy particularized identification at the pleading
> stage.  Where a fiduciary exercises discretionary control over a plan, and
> assumes the responsibilities that this control entails, the victim of his
> misconduct often will not, at the time he files his complaint, be in a position
> to describe with particularity the events constituting the alleged misconduct.
> These facts will frequently be in the exclusive possession of the breaching
> fiduciary.   Even in cases where fraud is alleged, we relax pleading
> requirements where the relevant facts are known only to the defendant.

27

*Id.* at 1503 (internal citations omitted).

GM cites a number of cases explicitly applying Rule 9(b) to ERISA claims.  In fact, a post-*Concha* line of cases out of the Ninth Circuit, beginning with *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003),[15] supports GM's position that where claims "necessarily describe fraudulent conduct," they are subject to Rule 9(b) analysis.   In *Calpine ERISA*, the court explains:

> Ninth Circuit precedent requires district courts to apply the heightened pleading requirements of Rule 9(b) to all averments of fraud regardless of whether fraud is an essential element of the underlying cause of action.  *See Vess*, 317 F.3d at 1103-1105, 1108 ("Where, as here, the averments in the complaint necessarily describe fraudulent conduct, Rule 9(b) applies to those averments").   In fact, as stated in *Vess*, since "[f]raud allegations may damage a defendant's reputation regardless of the cause of action in which they appear, . . . [they] are therefore properly subject to Rule 9(b) *in every case*."   *Id.* at 1104 (emphasis added).   When fraud is not an essential element of a claim, and the claim includes non-fraud allegations, only the non-fraud allegations are exempt from the pleading requirements of Rule 9(b).   *Id.*  When particular averments of fraud are insufficiently pled under Rule 9(b), a district court must strip those averments from the claim and examine the remaining allegations to determine whether they state a claim. *Id.* at 1105.

> Here, while Plaintiff is correct that the sole cause of action alleged in the Amended Complaint is "breach of fiduciary duty," it is equally true that the Amended Complaint is specifically premised on averments of *fraud*.  In fact, the gravamen of Plaintiff's Amended Complaint is that Calpine and the Committee Defendants "breached [their] fiduciary duties to the Plan by disseminating misleading and incomplete information to Plan participants, and failing to inform participants . . . of material information regarding participants' investments in Company stock."  As such, under *Vess*, this Court must review Plaintiff's Amended Complaint under the Rule 9(b) pleading standard.

2005 U.S. Dist. LEXIS 34452 at *17-19 (some internal citations omitted).

---

[15]Interestingly, the Ninth Circuit in *Vess* does not discuss or even mention *Concha*.

28

Several federal courts have been persuaded by *Vess*, and a number of cases have followed its approach.  In fact, two non-ERISA cases in this district have quoted *Vess* at length and adopted its reasoning.  *See Brege v. Lakes Shipping Co.*, 225 F.R.D. 546, 549 (E.D. Mich. 2004) ("if an allegation in a pleading contains 'an averment of fraud,' whether as part of a fraud claim or an element of a non-fraud claim, the 'averment of fraud' must be stated with the requisite particularity."); *Tramontana v. May*, 2004 U.S. Dist. LEXIS 4557, *18 (E.D. Mich. March 16, 2004) (same).

This Court finds *Vess* persuasive as well,[16] and agrees that the rationale behind Rule 9(b) applies where a plaintiff alleges that a defendant has lied, albeit in the context of a fiduciary duty claim, and albeit without use of the word "fraud."

Plaintiffs therefore may not rely on the allegations that "sound in fraud"--e.g., that the GM Defendants "ma[de] material misrepresentations" and "convey[ed] inaccurate information"--unless they amend the complaint to conform with Rule 9(b).

---

[16]The Court recognizes an important distinction between the complaint at issue in *Vess* and the complaint in the present case.  In *Vess*, the Ninth Circuit stated,

> The complaint alleges that the APA, as part of the conspiracy with Novartis and CHADD, "fraudulently and falsely" represented that the diagnostic criteria for ADD in the DSM were scientifically reliable; that "[i]n an effort to cover up this fraud," the APA improperly clustered data from tests of diagnostic criteria for ADD with data from tests of diagnostic criteria for different and unrelated medical conditions; and that the APA "purposefully and fraudulently" failed to use objective criteria in the creation and promulgation of diagnostic criteria.  The complaint further alleges that the APA has "fraudulently failed to disclose . . . ."

317 F.3d at 1101.  Thus, the complaint in *Vess* actually alleged "fraud"--albeit in furtherance of a non-fraud cause of action--and unquestionably "sounded in fraud."  Here, Plaintiffs have used no such language.  Nevertheless, the Court finds the reasoning of *Vess* equally applicable in this case.

      **c.**     **The GM Defendants had a Duty to Convey Complete and Accurate Information to Plaintiffs**

GM argues that "ERISA imposes no affirmative duty to disclose information beyond that expressly required under ERISA's express disclosure provisions." (*Id.* at 26.)  GM quotes a 1998 Sixth Circuit case, in which the court noted, "It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed."  *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 405 (6th Cir. 1998).  But more recently, the Sixth Circuit has recognized that "the basic concept of a fiduciary duty . . . 'entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'"  *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 455 (6th Cir. 2002) (quoting *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 548 (6th Cir. 1999)).  *See also Unisys Erisa*, 74 F.3d at 441 ("an ERISA fiduciary has a duty under section 1104(a) to convey complete and accurate information when it speaks to participants and beneficiaries regarding plan benefits").  Thus, ERISA not only prohibits GM from conveying false information, it also requires GM to provide *complete* information when speaking to Plan participants, when it knows that silence may be harmful.  Thus, Plaintiffs' allegation that the GM Defendants "fail[ed] to provide complete and accurate information" states a viable claim for relief.  Moreover, this allegation is sufficiently specific, since it does not "sound in fraud."  Plaintiffs may pursue this theory under Count II without amending the Complaint.

      **4.**     **Plaintiffs' Count III**

30

GM briefly argues that Plaintiffs' Count III, which alleges "failure to monitor appointed plan fiduciaries and provide them with accurate information," is "completely derivative of the[] prudence claim" in Count I of the Complaint, and therefore should be dismissed. (Br. of GM at 32.) GM further argues that Plaintiffs "do not allege any more specific actions take--or not taken--by the defendants with regard to their duty to 'monitor.'" (*Id.* at 31.)

If one fiduciary is legally prohibited from investing in GM stock because of his knowledge of certain facts, he should not be permitted to employ another fiduciary to do so without providing necessary information and monitoring the proxy's decisions. Because the Court has ruled that Plaintiffs state a prudence claim in Count I, and because Count III is sufficiently specific to satisfy Rule 8(a)'s notice pleading requirement, Plaintiffs' Count III states a viable claim for relief.[17]

### 5.    Plaintiffs' Count IV

In Count IV, Plaintiffs allege that GM breached its duty to avoid conflicts of interest by, among other things, failing to appoint independent fiduciaries to make investment decisions. (¶ 205.) In particular, "Defendants named in this Count clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plans and their participants." (¶ 204.)

---

[17]Plaintiffs do not specify the "appointed plan fiduciaries" at issue in this claim. If discovery shows that Plaintiffs' claims refer only to Defendant State Street, however, then the Court has doubts about whether Plaintiffs can prevail on this issue. As discussed below, State Street had very little discretion, so it would appear inconsequential whether-- and to what extent--the GM Defendants named in this claim monitored or provided accurate information to State Street. The Court leaves this particular issue for resolution at a later date.

GM argues that "[t]here is no explanation--much less any specific allegations--as to how the [artificial] inflation of the price of GM stock (assuming it occurred), is 'evidence' of a 'conflict' between the defendants and Plan participants." (Br. of GM at 33.)  But the Court finds this to be a narrow reading of the Complaint.  Taking Plaintiffs' specific allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the Court finds support for the claim that certain of the GM Defendants had impermissible conflicts of interest with regard to the GM Plans.  As discussed above, to state a valid claim, Plaintiffs need not identify all of the evidence necessary to prove their case.

GM also argues that "[t]his aspect of plaintiffs' claim . . . fails for the same reason their basic produce [sic] claim fails."  Because the Court has found Count I to state a valid claim for relief, however, GM's argument here must fail as well.  Plaintiffs' Count IV therefore states a viable claim for relief.

### 6.      Plaintiffs' Count V

GM's only argument as to Plaintiffs' Count V, which alleges co-fiduciary liability for failing to remedy co-defendants' conduct, is that it is "entirely derivative of Counts I-IV." (Br. of GM at 34.)  As the Court has ruled against GM on each of the above Counts, it also rules against them as to Count V.

### B.      State Street Bank Defendants

Defendant State Street argues that Plaintiffs' Counts I and VI should be dismissed for two reasons.  First, State Street argues that because it is a directed trustee, without discretion to divest the Plans of GM stock, it cannot be held liable for breach of a fiduciary duty.  Second, State Street contends that because it did not have reliable non-public information of GM's financial woes, and because the public information was insufficient to

32

give State Street notice of the severity of GM's alleged problems, it should not be held liable for investing Plan funds in GM stock.  Because State Street is correct as to the first of these, the Court need not address the second.

ERISA's definition of a fiduciary encompasses those who "exercise[] any discretionary authority or discretionary control respecting management or disposition of [a plan's] assets," or "ha[ve] any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).  For obvious reasons, fiduciary responsibility cannot extend to areas over which the alleged fiduciary has no discretion.

There are two principle documents governing State Street's responsibilities and authority as a fiduciary.  The first is the Master Trust Agreement ("Trust"), into which State Street and GM entered in 1994.  The Trust establishes State Street's status as trustee of the Plans, albeit with limited authority regarding where to invest: "The Trustee shall maintain separate Investment Funds for each class of common stock of the Company . . . . Each such Investment Fund shall consist of the applicable class of common stock of the Company and cash or short term U.S. Treasury securities or investments . . . ."  (Trust at 11.)[18]  The Trust further establishes that State Street had a duty to act as a prudent fiduciary for the purpose of providing benefits to Plaintiffs:

> The Trustee shall discharge its duties hereunder solely in the interest of the participants in the Plans and their beneficiaries and (i) for the exclusive purpose of providing benefits to such participants and beneficiaries, (ii) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims by diversifying, unless clearly not prudent to do so, the investments

---

[18]Due to a filing error, the Trust is attached to a supplemental filing (Doc. 36); Exhibit 5 to State Street's Brief, which purports to be the Trust, is an unrelated document.

of the Plans subject to its management and control to the extent required to minimize the risk of large losses to the Plans, and (iii) in accordance with the provisions of this Agreement insofar as they are consistent with the provisions of ERISA, but the duties and obligations of the Trustee shall be limited to those imposed upon it by this Agreement.

(*Id.* at 52-53.)[19]

The Trust gives some discretion to the Plans' investment manager, a role eventually occupied by State Street as well.[20]  This includes the discretion "to direct the time and manner in which purchases and sales of securities and other property to be made."  (*Id.* at 22.)  Moreover, the Trust states that "[t]he Investment Manager of an Investment Account shall have the power and authority to be exercised in its sole discretion at any time and from time to time to issue orders for the purchase or sale of securities . . . ."  (*Id.* at 23.)  State Street's discretion to divest the Plans of GM stock is limited, however, to meeting "cash flow requirements":

The Investment Manager designated by GMIMCo shall determine the applicable amount of Company common stock and cash or short term fixed income securities for a Company Common Stock Fund, from time to time, based on its estimates of the cash flow requirements of such Company Common Stock Fund and the investment guidelines of the company stock fund.

(*Id.* at 11-12.)

In 1998, when State Street was named investment manager, it entered into an Investment Management Agreement ("Agreement").  The Agreement contains language similar to the Trust: "SUBJECT TO THE TRUST AGREEMENT AND THE WRITTEN FUND

[19]Plaintiffs' Brief omits Clause (iii) of this paragraph, which limits trustee responsibilities.  (Br. of Pls. at 4.)

[20]As discussed above, State Street was not named Investment Manager under the Trust immediately, but became Investment Manager later, during the class period.  (¶ 4.)

POLICY FOR EACH INVESTMENT ACCOUNT . . . the Investment Manager shall be responsible in its sole judgment and discretion for the management and investment of the Investment Accounts." (Agreement at 2.) Section I of the agreement states that "[t]he investment manager shall determine the applicable amount of common stock . . . and cash or short term fixed income securities for each Investment Account, from time to time, based on its estimates of the cash flow requirements of such Investment Account and the Fund Policy . . . ." (*Id.*)

Under these terms, and under a general understanding of the Trust and Agreement, State Street has the discretion, as trustee and investment manager, to determine how much to invest in GM stock versus other liquid assets. As State Street points out, the only purpose of the other liquid assets is to meet the cash flow demands of the Plans, and State Street has no discretion to divest GM stock simply to save money or avoid risk. This is consistent with the Trust's description of the Funds as ESOPs. (*See id.* at 12-14.)

State Street argues that because it only has discretion to decide how much to invest in GM stock versus other liquid assets for cash-flow purposes--the amount of which is intended to be extremely limited--it is a "directed trustee," and thereby absolved of fiduciary liability when they follow the appropriate directions of named fiduciaries. *See* 29 U.S.C. § 1103(a); *Grindstaff v. Green*, 133 F.3d 416, 426 (6th Cir. 1998) ("directed trustee . . . is not a fiduciary to the extent it does not control the 'management or disposition' of the ESOP stock it holds in trust.").

Plaintiffs attempt to show that language in the Agreement contradicts State Street's position, including the following:

35

> The Investment Manager acknowledges that it is a fiduciary, within the meaning of ERISA, with respect to the Programs . . . . The Investment Manager shall discharge its duties under this Agreement solely in the interest of the participants of the Programs and their beneficiaries . . . (iii) by diversifying the investments in the Investment Accounts so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and (iv) in accordance with the documents and instruments governing the Programs and the provisions of this Agreement insofar as they are consistent with the provisions of ERISA . . . .

(*Id.* at 7.)[21]

The "documents and instruments" governing the Plans include their prospectuses, both of which contain the following clause:

> Investment Strategy:
>
> Invests solely in the shares of GM . . . , except for a small portion ordinarily targeted at 1%, dedicated to short-term fixed income investments and money market instruments. These latter groups of securities provide liquidity for loans, withdrawals, and exchanges by participants in this Fund.

(Salaried Plan Prospectus at 20; Hourly Plan Prospectus at 9.)

To be sure, the language in these documents is somewhat conflicting, perhaps on account of poor draftsmanship. Plaintiffs are correct that the Plans appear to direct State Street to diversify the Plans' funds, but they seem to ignore that if State Street was to diversify, it would be inconsistent with other terms and conditions of the plans as well as the general policy of the Plans as ESOPs.

State Street points out the flaw of Plaintiffs' reasoning:

> Plaintiffs are asking the Court to ignore all of the critical language in the Agreement that is inconsistent with their argument. To begin with, it would defeat the plainly stated purpose of the Agreement for the Court to read the

---

[21]Plaintiffs only quote the helpful portion of the this excerpt, omitting Clause (iv), which requires consistency with "the documents and instruments" governing the Programs." (*See* Br. of Pls. at 13.)

36

> contracts to say that [GM] has: (i) established GM Stock Funds for the very purpose of investing in GM stock as required by the Plan, (ii) limited the Investment Manager to holding assets other than GM stock only as necessary for liquidity needs, but (iii) then required the Investment Manager to generally diversify the investment accounts.

(Reply Br. of State Street at 6.)  The Court agrees with State Street that it did not have authority to diversify the Plans' funds generally, among various different investments.

Moreover, the Court agrees that State Street did nto have the authority to diversify much or all of the Plans' funds into cash or other liquid instruments.  In *DiFelice v. US Airways, Inc.*, 397 F. Supp. 2d 735 (E.D. Va. 2005), the plaintiff presented a similar argument under very similar facts.  The court there held,

> Plaintiff's argument . . . misunderstands the purpose of the cash component in the Company Stock Fund and the trustee's role in selecting the cash target range.  The cash component of the Company Stock Fund was plainly not intended as an alternative investment or hedge against the performance of the [corporate defendant], but rather as a means "to satisfy the Fund's cash needs for transfers and payments." . . . Contrary to plaintiff's assertions, [the trustee defendant] did not have the authority to alter the ratio of cash to stock in the Company Stock Fund for investment purposes.

*Id.* at 745-746.  *DiFelice* represents a logical resolution of the issue now before the Court.  In this case as well, Plaintiffs fail to account for the fact that State Street did not have discretion to divest the Plans of GM stock in lieu of other more favorable investments.  State Street's authority was strictly limited to investing a very small portion of the Plans' assets in liquid instruments.  Otherwise, it was required to invest in GM.

Plaintiffs also argue that State Street cannot be both a "directed trustee" and an "investment manager" because the former takes its directions from the latter.  Plaintiffs rely on 29 U.S.C. § 1002(38), which provides, "The term 'investment manager' means any fiduciary (other than a trustee . . . ) . . . who has the power to manage, acquire, or dispose

37

of any asset of a plan . . . ."  The Court finds Plaintiffs' argument too formalistic and inapplicable to the facts presented here.

State Street's discretion as both a directed trustee and as an investment manager was extremely limited.  Under the Plans, the Trust, and the Agreement, State Street simply had no discretion to act in the way that Plaintiff suggests it should have.  For the reasons discussed above, the Court hereby GRANTS Defendant State Street's Motion to Dismiss.

## IV.    Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above and on the record, the Court hereby DENIES the GM Defendants' Motion to Dismiss and GRANTS Defendant State Street's Motion to Dismiss.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  April 6, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 6, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager